FRANCES BERG SHERMAN *et al.*, Plaintiffs-Appellees, Cross-Appellants, and Counterdefendants-Appellees, *v.* JOSEPH R. KLOPFER, Defendant-Appellant, Cross-Appellee, and Counterplaintiff-Appellant.

(No. 57775;

First District (5th Division)—September 12, 1975.

Altheimer & Gray, of Chicago (Lionel G. Gross and Kenneth R. Gaines, of counsel), for appellant.

Norman J. Barry and Joseph P. Della Maria, Jr., both of Chicago (Rothschild, Barry & Meyers, of counsel), for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendant appeals from a judgment based upon the trial court's finding that he had breached his fiduciary duty to plaintiff Sherman. The judgment (1) voided a purchase and sale agreement and a general partnership agreement by which defendant (Klopfer) and his aunt (Sherman) effected the purchase of a going warehouse business; (2) dissolved the parties' equal partnership which managed the warehouse building

and land and ordered the property sold and the proceeds distributed first to reimburse Sherman for her employment contract and then to the parties equally; (3) imposed a constructive trust upon Klopfer's 49% interest in Wakem & McLaughlin (conditioned on liquidation of the corporation) and ordered the public sale of the corporation's assets (exclusive of the land and building) and the distribution of the proceeds in accordance with the party's 51% to 49% ratio of ownership in the corporation; and (4) denied Klopfer's counterclaim for plaintiffs' alleged breach of fiduciary duty. Plaintiffs have moved to dismiss defendant's appeal and their motion has been taken with the case. Plaintiffs have also cross-appealed from that portion of the judgment which provides for distribution of the proceeds of the sale of the assets of each entity in accordance with each party's respective interests in those entities.

On February 3, 1970, plaintiffs filed a complaint alleging that defendant owed Sherman certain fiduciary obligations arising out of their familial relationship and their attorney-client relationship and that defendant breached these duties by failing to provide her with control of the business including the power to unilaterally dispose of its assets, by refusing to consent to the sale of the business, and by seeking to manipulate a financial windfall for himself. The complaint sought an order authorizing sale of the business, rescission of the parties' agreements, and transfer to Sherman of all defendant's interests in both the partnership and the corporation in exchange for his initial contribution. On the eve of trial, plaintiffs filed an amendment to their complaint alleging that in addition to the other fiduciary duties he owed, defendant also owed Sherman fiduciary duties arising out of their partnership and that he breached all these duties when he and his agents disclosed information about Sherman to the Internal Revenue Service.

Copies of various documents including the purchase and sale agreement and the general partnership agreement were attached to the complaint. The former was executed by Wakem & Mc Laughlin and by Sherman and Klopfer. It provides that the corporation shall employ both shareholders at salaries established from time to time; neither may encumber or dispose of his stock without the corporation's consent; either may sell or give his or her shares to the other; in the event that either wishes to dispose of his or her stock the corporation (or if it refuses to act, the other shareholder) must be offered and may purchase the shares; in the event of the death of either shareholder, his or her stock must be purchased by the corporation to the extent it may legally do so and the remainder by the other shareholder; the purchase price in either event is the stock's book value as of the month prior to such event; that such price, plus interest at six per cent per year, must be paid in monthly in-

stallments over a period of five years; and as security for payment, the corporation shall not take certain specified actions and the stock to be transferred shall be retained until payment is made. The second paragraph of the agreement had been stricken. It had provided that each shareholder would be elected as a director and that if a third director were required, the shareholders would jointly select him.

In the general partnership agreement, Sherman and Klopfer agreed that they would manage certain real property at 4045 W. Chicago Avenue (where Wakem & Mc Laughlin conducts business); they would own that property as beneficiaries of a land trust; they would contribute equal amounts of capital, share profits and losses equally, and generally have equal rights; they would receive no salaries; neither would encumber or dispose of his or her interest without the written consent of the other; either may sell or give his or her interest to the other; either may retire at the end of a fiscal year; that in the event of the death or retirement of either partner, the other may elect to purchase the other's interest or to liquidate the partnership; the purchase price of a partnership interest was fixed as follows: the amount of the decedent's or retiring partner's capital account as of the end of the month prior to the event triggering purchase, adjusted for capital changes during the month of the event and for depreciation calculated on a straight-line basis, but making no provision for goodwill; such price, plus interest at six percent per year, must be paid in monthly installments over a period of five years; and the beneficial interest in the land trust shall be held as security for payment.

Defendant filed answers denying and attempting to explain the substantive allegations of both plaintiffs' complaint and the amendment thereto. Defendant also filed a counterclaim which, as amended, alleged that Sherman owed him certain fiduciary obligations arising out of their familial relationship, her role as majority stockholder of Wakem & Mc Laughlin, and her partnership with him; and that she had breached these duties by fraudulently inducing him to invest his funds, by failing to honor her commitments to him, by removing him from office and terminating his salary, and by otherwise freezing him out of the business. Defendant sought an order setting aside certain corporate acts by which he was removed from office and his salary terminated; forbidding Max Crocker from acting as a director; prohibiting the payment of attorney's fees by the corporation; and requiring Sherman to sell her shares in Wakem & Mc Laughlin and her partnership interest to him pursuant to the agreements they had executed. Plaintiffs filed a reply to defendant's answer and an answer to the counterclaim denying and attempting to explain their substantive allegations.

A copy of an agreement the parties had entered on August 8, 1968, modifying various provisions of both the purchase and sale agreement and general partnership agreement was attached to defendant's answer. It provides that the prior agreements operate interdependently; the price of the stock purchased pursuant to the purchase and sale agreement (book value) is adjusted to permit provision for insurance on the lives of the shareholders; the limitations on the corporation's activities during the period of purchase were extended; the surviving shareholder is required to purchase a deceased shareholder's stock; the purchase price of a partnership interest is to be based upon appraisal of the property and the amount of $75,000 is to be added or subtracted depending on whose interest is purchased; and as security for payment, provision was made for a promissory note secured by the beneficial interest in the land trust and for the mortgage refinancing, subject to certain limitations, upon the death of either partner with the heirs of such partner bearing the finance charges.

The matter then proceeded to trial where the following pertinent evidence was adduced:

*Defendant Joseph R. Klopfer under section 60.*

He is a lawyer and Frances Berg Sherman is his aunt. In 1967, he was in his mid-thirties and she was in her early seventies. After the death of his father, she assumed parental responsibility and gave him and his family generous gifts. In November of 1967, he drafted a will for her under which he was a beneficiary equally with other relatives.

In 1962 or 1963, he wanted to purchase Wakem & Mc Laughlin, the warehouse firm which employed his aunt, and started discussing that possibility with his friend and accountant Al Levine. These discussions continued intermittently until mid-1967, when he and his aunt offered to purchase the business for $1,500,000, less $150,000 which the firm owed Sherman under her employment contract. This offer was accepted in July of 1967.

He and Sherman then held discussions, some with Levine, regarding how the sale should be consummated and regarding the best structure for operating the business. Sherman wanted to be able to control the everyday operations while he wanted to be able to purchase her interest when she left the business. They then consulted with Stan Polak, an attorney employed by the accounting firm Alexander Grant & Co. regarding how to conduct their business. It was decided that the business should be conducted as a corporation, with Sherman owning 51% of the stock and Klopfer owning the remaining 49%; but that the major asset of the business, the land and building, should be held in a partnership, each partner owning a 50% interest. This method of holding the property

was similar to the way the seller had conducted its business except that it held its major asset in a wholly owned corporate subsidiary, Way-Mac.

During the fall of 1967, in order to consummate the purchase, Klopfer prepared the articles of incorporation and by-laws for Berg Corporation which had two directors and was capitalized at $10,000. He and Sherman met with attorneys for the seller regarding the terms of purchase, and they simultaneously secured a mortgage commitment from the Equitable Assurance Co. He handled much of the correspondence relating to this commitment. After discussing various drafts of the purchase agreement prepared by the seller's attorneys, the parties closed the sale. A purchase agreement and a bill of sale for the seller's assets (other than Way-Mac stock) were signed transferring these assets to Berg Corporation and a purchase agreement and an assignment for Way-Mac stock were signed transferring the stock to Sherman and Klopfer. Without considering the employment contract, they each contributed equal amounts (approximately $150,000) except that Sherman contributed $200 more to account for her 51% interest in Berg Corporation. Interim financing prior to finalizing the mortgage arrangements was handled through the Lake Shore Bank.

The old Wakem & Mc Laughlin was then dissolved and Klopfer arranged to have the Berg Corporation assume its predecessor's name. He also dissolved Way-Mac, deeding the land and building to the Lake Shore Bank as trustee of a land trust with him and Sherman as beneficiaries of undivided one-half interests. In cooperation with attorneys for Equitable, an industrial lease was entered between the trustee and the new Wakem & Mc Laughlin. In addition, after numerous discussions with Sherman (although Levine and Polak may also have contributed their ideas), he completed the final draft of the purchase and sale agreement and general partnership agreement, and those agreements were signed in October of 1967.

Subsequently, the mortgage arrangements with Equitable were finished. Klopfer completed some of the necessary papers and dealt with Equitable's attorneys regarding some of the details. In the process, Al Kahn, Klopfer's law partner, signed a letter of opinion in which he represented that he was attorney for the borrowers. The mortgage arrangements were finally closed in November of 1967. Klopfer admitted that his signature appeared on a letter to Equitable typed on Wakem & Mc Laughlin stationery, which referred to a publicity draft regarding the mortgage; but testified that he could not specifically recall the letter. The publicity draft represented that Klopfer had handled the legal details for the borrowers. The letter and draft were admitted into evidence

after an expert document examiner testified that they had been typed on the same typewriter.

Klopfer testified that no lawyer representing Sherman was present during these transactions. Although he insisted that he did not represent her in these dealings, he admitted that he had not told her that two-thirds control of a corporation was required in Illinois before its assets could be sold. Klopfer agreed that as a result of his employment with Wakem & Mc Laughlin his income increased substantially.

In the summer of 1968, the parties deleted the second paragraph of the purchase and sale agreement and Sherman consulted attorney Milton Shadur. After negotiations, the parties agreed to modify their prior agreements. The two-thirds requirement for sale and assets was mentioned during these negotiations.

In the summer of 1969, Klopfer resigned from Wakem & Mc Laughlin. Again the parties met with Shadur. During these discussions, Klopfer offered to purchase Sherman's interest and Shadur told Sherman she could not unilaterally sell the business. Following these discussions, Klopfer resumed his employment.

In December of 1969, Sherman received an inquiry from Distribution America regarding purchase of the business for an amount more than one million dollars greater than their cost. Klopfer told Sherman he was not interested in selling, but did not oppose negotiations. However, Sherman cancelled a meeting with the firm.

*Alan Levine*

Until 1970, when he thought Klopfer was having an affair with his wife, he was Klopfer's friend and accountant. In the early 1960's Klopfer began talking to him about purchasing Wakem & Mc Laughlin. In early 1967, these discussions became very frequent, almost daily. He advised Klopfer that Sherman could be subject to income tax liability if her employment contract were used to reduce the purchase price for the business and he suggested the structure for the business which was ultimately adopted. He attended two meetings with both Sherman and Klopfer before their offer to purchase was accepted. At these meetings, Sherman said she wanted complete control of the business and therefore wanted a 60% interest. Klopfer, who wanted equality with Sherman, was unreceptive to this suggestion and told Sherman that 51% would give her as much control as 60%.

After being fired, Klopfer was upset and talked to him about turning Sherman in to the Internal Revenue Service. Ultimately Klopfer told him that he was going to have his girlfriend, Mildred Kelly, report Sherman; and Levine was present when Kelly told them the details of

her meeting with the Internal Revenue Service. At no time did he urge Klopfer to inform on Sherman, and he denied ever suggesting that Klopfer do so. He also denied telling his former wife that he was going to get Klopfer.

*Plaintiff Frances Berg Sherman on her own behalf.*

She started working for Wakem & Mc Laughlin when she was 14 years old. The owners delegated increasingly more responsibilities to her until she was running the business herself and eventually became president of the company and a member of its Board of Directors although she owned no stock. Moreover, she was generous with her relatives, giving them both her aid and various gifts.

After Klopfer was admitted to the bar, he began handling her legal matters. Although he had not requested to see them, she showed him the financial statements of Wakem & Mc Laughlin; and he expressed an interest in working for her. During her employment, the corporation received various purchase offers and she observed that if such offers were accepted the new owners might eventually fire her.

In 1966 or 1967, Klopfer suggested that they purchase the business. She dismissed the suggestion, telling him he would not like the business; but when he renewed it, she investigated the availability of mortgage financing and then decided that they should make an offer, using her employment contract which had been valued at $150,000 as a credit against the purchase price. She had two conversations with Klopfer regarding control of the business. Levine was present at the second one. In both discussions, she insisted on complete control of the business; and although she was not concerned with percentages, she suggested ratios of ⅔ to ⅓ or 60% to 40%. At the second meeting, when Klopfer told her that 51% would give her the control she wanted, she agreed to that percentage. She told Klopfer how Peter Mc Laughlin, although he owned no stock, had gained control of the company and expressed the hope that nothing like that would happen to her. The possibility of selling the business to a third party was not discussed.

After their offer was accepted, Klopfer agreed to handle the legal details of the sale and she introduced him to both the representatives of the mortgagee and the attorneys for the seller as the attorney who would handle the transactions. While Klopfer was attending to these matters, he presented her with only one draft of the purchase and sale agreement and of the general partnership agreement and she signed them the same day. She admitted that she was aware that the latter provided for equal partnership interests. When the legal matters were completed, it was intended that Klopfer would phase out his law practice and

devote all his time to learning the business. However, he did act as attorney for the new corporation, handling various minor matters.

In August of 1969, after Klopfer resigned, she was very upset and had lunch with Ron Marcus. He told her for the first time that she could not sell the assets of the corporation and she subsequently confirmed that fact with Shadur.

Later, she received an inquiry from Distribution America regarding purchase of the business. When she told Klopfer, he said he was not interested; but later agreed to meet with their representatives. However, he changed his mind at the last minute and she unsuccessfully attempted to cancel the meeting. Later, she had lunch with them and suggested they might purchase the business for $2,750,000. They then sent a letter offering to purchase for that amount.

Following this testimony, plaintiffs rested their case.

*Max Crocker under section 60.*

He is an attorney formerly associated with Milton Shadur's law firm. One of the partners in that firm asked him to serve on the Board of Directors of Wakem & Mc Laughlin. He was elected to the Board and without talking to Klopfer, voted with Sherman to oust him.

*Ronald Marcus*

He is Klopfer's ex-brother-in-law who was very friendly with him until Klopfer was divorced. He had lunch with Sherman in 1969. Although he remembered the conversation, he could recall no mention of the percentage of control necessary to sell a business and was unaware of what percentage was required.

*Plaintiff Frances Berg Sherman under section 60.*

In the summer of 1968, after they had deleted paragraph two of the purchase and sale agreement, she consulted Shadur. He negotiated with Klopfer primarily regarding her employment contract, an appraisal value purchase price for the partnership interest, and salaries. Klopfer consented to the modification agreement and to amendment to the by-laws to provide for three directors. She did not discuss with Shadur whether she had complete control of the business. After the modification agreement was signed, Klopfer told her he was going to put the agreements away and did not want to hear about them again. She voiced no objections.

In November of 1968, she sent Shadur a confidential letter asking him to answer an advertisement in the Wall Street Journal which sought persons interested in selling an established warehouse business. The letter asked Shadur to bill her personally at home. She testified that she wrote the letter to keep abreast of the warehouse business.

In August of 1969, Klopfer resigned; but after discussions with Shadur, he returned. He agreed to sign an employment contract for her benefit; but when he refused to sign Shadur's draft, she slapped him. In 1969 and in 1970 (two weeks before she filed suit), she consented to sizeable salaries for herself and Klopfer. She had made payments to Shadur's firm and expected to make payments to her trial counsel, but was uncertain how these fees would be allocated between her and the corporation. She believed that either Mildred Kelly or Al Kahn had reported her to the Internal Revenue Service at Klopfer's request.

*Marilyn Levine*

She had recently been divorced from Al Levine and denied having an affair with Klopfer. However, she did assert that her husband had been involved with Klopfer's wife. After Klopfer was fired, both her husband and Klopfer's wife in several conversations advised him to report Sherman to the Internal Revenue Service; but Klopfer refused to do so. During their divorce proceedings, her husband told her he was going to get Klopfer.

*Al Kahn*

He was Klopfer's law partner. He denied giving any information about Sherman to the Internal Revenue Service.

*Mildred Kelly*

She is Klopfer's client and girlfriend. She admitted and the parties stipulated that she had intermittently over the past eight years had an affair with Klopfer despite the fact that he was married. When Klopfer was fired, she, Klopfer, and Al Levine (who was also her accountant) met and Levine advised Klopfer to report Sherman to the Internal Revenue Service; but Klopfer refused to do so. Later Levine convinced her to report Sherman; in March or April of 1970, she reported Sherman. Later she completed a form requesting a reward. When she told Klopfer she had reported Sherman, he was angry with her.

*Defendant Joseph R. Klopfer on his own behalf*

He had numerous discussions with Sherman regarding their purchase of Wakem & Mc Laughlin. Together, and sometimes with Levine, they fully discussed control of the business, its structure, their salaries, and her employment contract. Sherman wanted operating control of the business and wanted a ratio of 60% to 40%; however, he wanted equality of ownership. They ultimately agreed upon a 51% to 49% ratio. Later they went to Alexander Grant & Co. where, after they decided upon the structure of their business, they agreed to equal partnership interests. Levine had warned him of the potential tax consequences of using Sherman's employment contract as part of the consideration for the purchase and he discussed the matter with Sherman. Later, at Alexander Grant's,

they asked Polak what to do about the contract. He gave them no answer; but he did tell them not to show it on their books. In securing their mortgage commitment, Equitable expressed concern regarding Sherman's age; but they assured Equitable that Klopfer would continue to operate the business. When they met with the seller's attorneys, they consented to an agreement whereby the new corporation would assume liability for the employment contract. Klopfer gave Sherman three or four drafts of the purchase and sale agreement and of the general partnership agreement. She took these drafts home to study, and later they discussed them thoroughly. Klopfer threw his copies of the earlier drafts away.

Sherman held a dinner for all the employees where she introduced Klopfer. He began work at Wakem & Mc Laughlin by watching Sherman's activities and those of the various employees and occasionally would do their work. He admitted dictating about one hundred letters in regard to the business. At first he devoted his full time to his job; but later when Sherman refused to give him anything to do, he began spending increasingly more time away from work.

In the summer of 1968, Sherman called him into her office and questioned him regarding the second paragraph of the purchase and sale agreement. He became angry at her since she had been the one who had suggested it. He got his copy of the agreement and they deleted that provision. Then, particularly as a result of her concern over her employment contract, he told her to consult an attorney.

During the discussions with Shadur, Sherman said they should sell the business; but Shadur told her she could not do so; and Klopfer offered to purchase her interest. After the modification agreement (which provided that the purchase price of a partnership interest should be increased or decreased by $75,000 to provide for Sherman's employment contract) was signed, he told Sherman he did not want to hear any more about the agreements.

In 1969, when Sherman continued to refuse to give him any responsibilities, he resigned. However, after discussions with Shadur, he agreed to return to work if he were made general manager and given some responsibilities. Sherman said she wanted an employment contract. However, the terms of Shadur's draft of that agreement were unacceptable in that they provided that Sherman could fix her salary even after leaving the business. When Sherman discovered that he was reluctant to sign the agreement as written, she slapped him.

After he was fired, Max Crocker told him and his attorneys that he should try to get along with his aunt. Klopfer's 1968, 1969, and 1970 income tax returns indicate that his adjusted gross income for each year was $45,432, $57,515 and $9,950 respectively.

After presenting this evidence, defendant rested his case.

*Plaintiff Frances Berg Sherman in rebuttal*

She held a dinner for Klopfer to introduce him to the employees. She told them he was their boss and asked them to help him learn the business. At work, she told the telephone operator to refer inquiries to him; he made various purchases; and he dictated letters. However, increasingly he was absent from work and she was therefore reluctant to give him additional responsibilities. In November of 1971, she received a letter from the Internal Revenue Service increasing her income tax liability. Much of Sherman's testimony was corroborated by Elaine Gould, the switchboard operator at Wakem & Mc Laughlin, by James T. Rossiter, a clerk there, and by Elmer C. Kramer, the office manager.

*Milton I. Shadur*

He is a partner in the law firm of Devoe, Shadur, Plotkin, Krupp & Miller (which had filed the complaint in the instant case, but did not represent plaintiffs in the trial of the matter) and has been practicing law for 23 years.

In the summer of 1968, Sherman phoned him expressing concern that Klopfer had not represented her properly and asked him to review certain documents. After examining the various documents, he met with both Sherman and Klopfer. After obtaining certain background information including the fact that Sherman's employment contract had not been reflected in the books, he expressed his opinion regarding various provisions of the purchase and sale agreement and the general partnership agreement and Klopfer responded, agreeing with some suggestions and disagreeing with others. Shadur objected to the use of book value for valuing the stock of the corporation because it may not accurately reflect actual value; to the time at which such value is determined (the end of the month prior to the event triggering purchase) because a deceased shareholder would not receive the benefit of insurance on his life; and to the requirement that upon the death of a party his estate assume the cost of refinancing. During the course of negotiations, Klopfer agreed with virtually all Shadur's other suggestions including provision for adjustment of the price of partnership interest by $75,000 to provide for Sherman's employment contract, for the use of appraisal value for pricing a partnership interest, and for amending the by-laws to provide for three directors. Although Klopfer did suggest offering the business for sale to determine its value, they did not discuss whether Sherman had complete control of the business. The modification agreement was signed in August of 1968. Later, Sherman told him she and Klopfer were having difficulties and she wanted to determine what the business was worth.

She asked him to respond to an advertisement about purchase of a warehouse business.

In 1969, he met with Sherman who informed him that Klopfer had resigned. He told Sherman that she could not unilaterally sell the business and suggested that Klopfer be given more responsibilities. However, Sherman complained that Klopfer was frequently absent and had not given up his law practice. Shadur was able to arrange a meeting with the parties. During the meeting, Sherman suggested that they sell the business and Klopfer told her she could not unilaterally sell it and offered to buy her interest. Shadur confirmed that Sherman could not unilaterally sell it. Klopfer left the meeting. Later, Shadur phoned Klopfer and informed him that Sherman would be happy with an employment contract. However, after he drafted the contract, Klopfer told him it was unacceptable.

*Mildred Kelly for plaintiffs in rebuttal*

Although she was uncertain of the date, she typed the application for reward from the Internal Revenue Service on a typewriter in Klopfer's office while he was meeting with clients after 5 p.m. The court noted that the application was dated on a Saturday.

*Defendant Joseph R. Klopfer for himself in rebuttal*

Wakem & Mc Laughlin carried no insurance on its officers or shareholders, but Sherman had explored the matter.

Following this evidence, the trial court found that Klopfer acted as Sherman's attorney in purchasing Wakem & Mc Laughlin; Sherman relied upon Klopfer in purchasing and setting up the new business in accordance with her wishes; Sherman wanted "complete control" of the business; she agreed, based upon Klopfers' representations, to a 51% to 49% ownership ratio in the corporation and to a 50% and 50% ownership ratio in the partnership; Sherman's employment contract, which both parties intended she should ultimately receive, was used to reduce the purchase price of the business; Klopfer agreed to give up his law practice and the parties agreed that the survivor would purchase the other's interest; the parties subsequently entered a modification agreement but did not discuss control or sale of the business to third parties; Sherman first became aware in August of 1969 that she did not have complete control of the business when she told Shadur she wanted to sell the business; Klopfer absented himself from work frequently in 1969 and refused to negotiate regarding sale of the business; Wakem & Mc Laughlin terminated Klopfer's salary and officership on February 16, 1970; and Klopfer, in cooperation with another, reported Sherman to the Internal Revenue Service regarding her

employment contract which had reduced the purchase price of the business.

The court concluded that Klopfer owed Sherman fiduciary duties arising from their partnership and their attorney-client relationship; Klopfer breached these duties by failing to give her complete control in that Sherman could not sell the assets of the business or liquidate the corporation or partnership; the modification agreement did not compromise or waive the question of control since that issue was not discussed; plaintiffs proved the elements of their complaint and amendment regarding the dissolution of the partnership and the imposition of a constructive trust on defendant's stock; public sale of the assets of both the partnership and the corporation is required; the proceeds of such sale should be divided in accordance with the parties' interests in each entity after provision is made for Sherman's employment contract; and defendant is entitled to his salary for 1969 and for 1970 (until he was terminated) as that amount is adjusted in accordance with the party's reimbursement agreement. The court denied defendant's counterclaim except as provided above and entered the order from which the parties appeal. Although the trial court set an appeal bond of $100,000, defendant did not file such a bond.

During trial, the parties informed the court that the partnership property had been condemned. After trial, the parties received the condemnation award, which was divided equally after providing for Sherman's employment contract. Pursuant to the decree, a public sale of the assets of Wakem & Mc Laughlin was held. Sherman and Klopfer were the only participants at the sale and Sherman was the successful purchaser. Klopfer has not yet accepted his share of the proceeds of the sale.

OPINION

The arguments of the parties will be considered in the following manner: (1) plaintiffs' motion to dismiss defendant's appeal, (2) defendant's appeal from the granting of judgment on plaintiffs' complaint and amendment thereto, (3) defendant's appeal from denial of his counterclaim, and (4) plaintiffs' cross-appeal regarding the extent of relief granted by the trial court.

I.

■■ Plaintiffs contend that defendant's appeal should be dismissed because Klopfer voluntarily accepted the benefits of the judgment. They point out that Klopfer: (1) accepted $334,000 for his share of the partnership, and (2) participated in the public sale of the assets of Wakem & Mc Laughlin after executing a corporate resolution authorizing liquidation. If a party to a civil suit voluntarily accepts the benefits of a judg-

ment, his appeal is barred. *Katz v. Katz,* 10 Ill.App.3d 39, 293 N.E.2d 904.

In the instant case, we do not believe defendant accepted the benefits of the judgment. First, the trial court's judgment ordered public sale of the partnership property with the proceeds to be distributed equally between the parties after reimbursing Sherman for her employment contract. While Klopfer accepted $334,000 for his partnership interest, that amount was not the proceeds of a public sale of the partnership property pursuant to the judgment; it was the proceeds of a condemnation award. Although the exact amount to which defendant was entitled upon condemnation may be disputed, there can be no question, even applying plaintiffs' theory of the case at trial, that defendant is entitled to some amount. Moreover, the trial court specifically found that the parties always intended that Sherman would receive the benefit of her contract. The evidence at trial, including the provision in the modification agreement adjusting the purchase price of a partnership interest, supports the trial court's finding. We do not believe that Klopfer's acceptance of a fair amount of the proceeds of the condemnation award, which was in accordance with the parties' original intent regarding Sherman's employment contract and which also happens to correspond to the formula applied by the trial court in ordering the distribution of the proceeds of public sale of the partnership property, is the voluntary acceptance of the benefits of the judgment.

Second, while Klopfer did participate in the public sale of the assets of Wakem & Mc Laughlin and did execute a corporate resolution regarding liquidation, he did not accept his share of the proceeds of the sale, an amount in excess of $100,000. His actions cannot be described as being inconsistent with his position on appeal and cannot legitimately be described as accepting the benefits of the judgment. He did not have the use of the proceeds of the sale. In these circumstances, plaintiffs' motion to dismiss defendant's appeal is denied.

## II.

■■ Defendant contends that the trial court's judgment on plaintiffs' complaint and amendment thereto is erroneous. He argues that the trial court erred in finding that: (a) he had breached his fiduciary duty as an attorney by failing to give Sherman the ability to dispose of partnership and corporate assets unilaterally, (b) this breach was not waived or compromised when Sherman consulted another attorney, and (c) he had reported Sherman to the Internal Revenue Service.

Defendant first argues that the trial court erred, both legally and factually, in finding that he had breached his fiduciary duty as an attorney

by failing to give Sherman the ability to dispose of partnership and corporate assets unilaterally. The major dispute between the parties relates to the meaning of the term "complete control." While defendant asserts that legally "control" means a 51% ratio of stock ownership, in the context of the instant case, the meaning of the terms must be derived from the facts adduced at trial. Defendant asserts that the trial court's finding on this crucial issue was against the manifest weight of the evidence.

After hearing the evidence, the trial court concluded that Klopfer was acting as Sherman's attorney during the purchase of Wakem & Mc Laughlin. Klopfer denied representing Sherman and emphasized that he was a purchaser dealing with an experienced businesswoman, also a purchaser. However, Sherman testified that Klopfer was the only attorney she had since he graduated from law school and emphasized that he agreed to handle the legal details of the purchase. Clearly, Klopfer acted as an attorney regarding the purchase. He admitted drafting many legal documents necessary to close the deal; the publicity draft indicates that he took credit for handling the legal details; and in these circumstances the trial court could easily have believed Sherman's testimony that Klopfer agreed to handle the matter. As attorney for the purchasers, not only was Klopfer representing both himself and Sherman; but he was also put in the position, particularly by his drafting of the purchase and sale agreement and the general partnership agreement, of establishing the legal relationship between the parties with knowledge that Sherman was not represented by independent counsel and was relying upon his good faith. The trial court's finding that Klopfer was Sherman's attorney was warranted by the evidence.

■■ An attorney has a fiduciary relationship with his client which requires the attorney to exercise the utmost good faith in his dealings with his client. (See generally Ill. L. & Pr. *Attorneys and Counselors*, § 104.) Although an attorney is not prohibited from entering transactions with his client, such transactions are scrutinized carefully and the burden is on the attorney to prove the fairness of the arrangement. (*McFail v. Braden*, 19 Ill.2d 108, 166 N.E.2d 46.) An attorney should not profit by the breach of his fiduciary obligations.

In the instant case, the trial court found that Klopfer, as an attorney, breached his fiduciary duty to his client Sherman by failing to give her control of the business sufficient to sell its assets unilaterally. We can understand Klopfer's concern, as a purchaser, in having equal control with Sherman when he contributed an equal amount of capital and when the mortgage may not have been secured had he not been involved in the deal. However, Klopfer was *not* just a purchaser. He was also Sherman's attorney and as such owed Sherman the duty of dealing with her fairly.

¶ 4 · On the record before us, we believe the trial court could properly have concluded that Klopfer had not dealt fairly with Sherman regarding the extent of her control of the business. Klopfer insists that Sherman was an experienced businesswoman who knew or could be expected to know the significance of 51% ownership of the corporation and of 50% interest in the partnership. However, Klopfer admitted that he had not informed her that two-thirds ownership of the corporation was required to sell the assets and Sherman denied having such knowledge. Although Klopfer argues that Sherman wanted only operating control of the business, Sherman testified that she wanted "complete control" of the business; her testimony was corroborated by Levine; and such a position was not necessarily unreasonable in view of her experience in the business, notwithstanding Klopfer's intent to enter the business as his full-time career. Moreover, the burden was on Klopfer, as an attorney, to prove that he dealt fairly with his client and the trial court could properly have concluded that Klopfer did not sustain his burden of proof. In these circumstances, we cannot say that the trial court's conclusion that Klopfer breached his fiduciary duty was against the manifest weight of the evidence.

Defendant next argues that the trial court erred in finding that his breach of his fiduciary obligation was not waived or compromised when Sherman consulted another attorney. He asserts that this finding is inconsistent with the court's prior finding that he breached his fiduciary obligation because it indicates that the parties did not contemplate sale to a third party. Furthermore, relying upon *Schmidt v. Landfield*, 23 Ill. App.2d 55, 161 N.E.2d 702 *aff'd*, 20 Ill.2d 89, 169 N.E.2d 229, he suggests that as a matter of law Sherman's consultation with Shadur waived his breach of fiduciary duty.

Defendant's argument, bolstered to some extent by Shadur's testimony that Sherman consulted with him because of her concern over whether Klopfer had represented her properly, is premised upon the fact that the issue of complete control was raised or should have been raised at the parties' 1968 meeting with Shadur. However, only Klopfer's testimony supports this position; and the trial court, being in the best position to view the demeanor of the witnesses, apparently did not believe Klopfer. Moreover, the modification agreement does not mention sale of the business to a third party and both Sherman and Shadur testified that the issue did not arise until 1969. In these circumstances, the trial court could properly have determined that the question of complete control was not discussed during these negotiations. If complete control was not discussed with Shadur in 1968, a prior breach of fiduciary duty founded upon that issue could not possibly be waived since nothing vitiated Sherman's prior

reliance upon Klopfer's good faith. We find nothing inconsistent or legally erroneous in this determination.

Defendant also argues that the trial court erred, both factually and legally, in finding that he had reported Sherman to the Internal Revenue Service. Factually, while the evidence linking Klopfer to the act of reporting Sherman is conflicting, the record does contain ample evidence to warrant the trial court's finding. Levine's testimony, indicates that Klopfer asked his girlfriend, Mildred Kelly, to report Sherman; and Kelly admitted reporting Sherman. Moreover, Kelly's relationship to Klopfer and the circumstances surrounding Klopfer's termination support the trial court's conclusion.

■■ Legally, since a fiduciary owes a duty of exercising the utmost good faith and loyalty (see, *e.g.,* Ill. L. & Pr. *Attorneys and Counselors* § 104), a fiduciary may breach his duty by reporting the other party to the Internal Revenue Service. In the instant case, Klopfer's breach of his duty to exercise good faith and loyalty to Sherman was aggravated by the subject matter of his report. Although Klopfer had recommended that Sherman use her employment contract to reduce the purchase price of the business, this employment contract was the subject matter of his report to the Internal Revenue Service. We do not believe a breach of fiduciary obligation is any less of a breach because it occurred after the other party to the relationship filed a complaint relating to the matter or because the instant breach may not have triggered an investigation. We cannot say that the trial court erred.

### III.

■■ Defendant has also appealed from denial of his counterclaim which sought: (1) payment of his salary for the period following his allegedly improper termination from Wakem & Mc Laughlin, and (2) prohibition of the payment of attorneys' fees by Wakem & Mc Laughlin for the instant case. Except for the purchase and sale agreement, Klopfer had no continuing right of employment with Wakem & Mc Laughlin, but that document did provide that shareholders must be employed. However, the purchase and sale agreement was properly voided because of defendant's breach of fiduciary duty. Moreover, the evidence clearly shows that Klopfer was absent from work for increasingly longer periods of time during 1969 and 1970 although work was available. Furthermore, Klopfer rendered no services to the corporation after his termination. Although Klopfer asserts that Sherman breached her fiduciary duty to him, in the circumstances of this case, notwithstanding the corporate resolutions regarding salary which were executed shortly before his termination, we find no breach of duty on Sherman's part; but rather, in light

of Klopfer's unfairness and absenteeism, we find that the corporation was justified in terminating Klopfer and in paying attorneys' fees to rectify Klopfer's wrong to the corporation. The trial court properly denied Klopfer's counterclaim.

## IV.

■■ On their cross-appeal, plaintiffs contend that the trial court erred in ordering a remedy which unjustly enriched defendant. They argue that distribution of the net assets of the corporation and of the net assets of the partnership (after reimbursing Sherman for her employment contract) unjustly enriched defendant. However, we note that although plaintiffs' complaint sought an order voiding the parties' agreements and transferring Klopfer's interests in the partnership and the corporation to Sherman in exchange for her repayment of his capital contribution, during his closing argument plaintiff's trial counsel specifically requested the relief which was ultimately granted by the court. In these circumstances, plaintiffs' cross-appeal is barred.

Plaintiffs' motion to dismiss the defendant's appeal is denied, and the judgment of the trial court is affirmed.

Motion to dismiss appeal denied; judgment affirmed.

BARRETT, P. J., and SULLIVAN, J., concur.